# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

DONNY J. SEXTON,

        Claimant,

vs.

NANCY BERRYHILL,
Acting Commissioner of
Social Security,

        Defendant.

No. 18-CV-1024-LTS

**REPORT AND RECOMMENDATION**

_____

Donny J. Sexton ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.     BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 13) and only summarize the pertinent facts here. This is an appeal from a denial of a request for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits.

Claimant was born on August 1, 1989. (AR[1] at 209.) Claimant has an eleventh-grade education. (*Id.* at 50.) The ALJ found Claimant "has a limited education and is able to communicate in English." (*Id.* at 34.) Claimant allegedly became disabled due

---

[1] "AR" cites refer to pages in the Administrative Record.

to mental illness on January 1, 2009, when he was 19-years-old. (*Id.* at 26.) He filed his initial claim for DIB on January 9, 2015. (*Id.* at 209.) He filed his initial claim for SSI benefits on January 29, 2015. (*Id.* at 222.) Claimant was initially denied benefits on both claims on May 4, 2015. (*Id.* at 125, 129.) Claimant filed for reconsideration on June 4, 2015 and was again denied on July 1, 2015. (*Id.* at 137, 140, 149.) Claimant filed a Request for Hearing on July 16, 2015. (*Id.* at 160.) A telephonic hearing was held on May 17, 2017 with Claimant and his counsel in Iowa and ALJ Christina Mein and a vocational expert in Topeka, Kansas. (*Id.* at 44.)

The ALJ issued her decision denying Claimant benefits on June 28, 2017. (*Id.* at 23-42.) On July 31, 2017, Claimant filed a Request for the Appeals Council to review the ALJ's decision. (*Id.* at 208.) On November 27, 2017, the Appeals Council found there was no reason to review the ALJ's decision. (*Id.* at 1.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On January 19, 2018, Claimant timely filed the instant complaint in this Court. (Doc. 4.) By December 4, 2018, the parties had filed their briefs and the Honorable Leonard T. Strand, Chief United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.  DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A claimant is not disabled if he or she is able to do work that exists in the national economy, but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations.  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity."  *Id.*  If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).  "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation."  *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled.  *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities."  *Id.* § 416.920(c).  The ability to do basic work activities means the ability and aptitude necessary to perform most jobs.  These include the following:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his or her application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work

the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* Pts. 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in substantial numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

The ALJ made the following findings at each step with regard to Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date of disability.[2]  (AR at 28.)

At step two, the ALJ found that Claimant had the following severe impairments: generalized anxiety disorder, major depression, panic disorder, and personality disorder. (*Id.* at 29.)  In addition, the ALJ found that Claimant had some non-severe impairments including a non-epileptic seizure disorder and substance abuse.  (*Id.*)

At step three, the ALJ found that none of Claimant's impairments met or equaled a presumptively disabling impairment in the listings.  (*Id.*)  Specifically, the ALJ considered the "paragraph B criteria" and "paragraph C criteria" of two broad categories of mental disorders, listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  (*Id.* at 29-30.)

At step four, the ALJ found Claimant had no past relevant work (*Id.* at 34), but had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [T]he claimant cannot work at unprotected heights, hazardous machinery
> or standing bodies of water. He can perform three to four-step tasks that

---

[2] The ALJ noted that Claimant worked every year since applying for benefits, but the work did not rise to the level of "substantial gainful activity."  (AR at 28.)

are simple, repetitive and routine. The claimant cannot interact with the public, but can occasionally interact with co-workers and supervisors.

(*Id.* at 30-31.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could still perform with his RFC, including counter supply worker, stubber,[3] and linen room attendant. (*Id.* at 35.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

**B.    *Relevant Medical Evidence***

**1.    *Claimant's history of in-patient treatment***

On January 27, 2015, Claimant was admitted to the emergency room for an attempted suicide attempt by hanging. (AR at 396.) Claimant denied a suicide attempt and argued the mark on his neck was from a 2007 suicide attempt. (*Id.*) The physician who saw Claimant at the time noted, however, that the markings on Claimant's neck were "clearly from tonight, not 7 years ago" and stated that Claimant was "unreliable, unpredictable, and untrustworthy." (*Id.* at 398.) Claimant was admitted to the hospital. (*Id.*) Claimant insisted on being discharged later that day, and was discharged after he was considered to no longer be at significant risk of suicidal behavior. (*Id.* at 393.) Claimant testified at the hearing that he has tried to hang himself at other times. (*Id.* at 59.)

After being admitted to the hospital on March 25, 2016, a mental health commitment order was issued out of Dubuque County on March 28, 2016, ordering Claimant "committed for a complete psychiatric evaluation and appropriate treatment at a suitable facility" due to his danger to himself. (*Id.* at 449-50.) Claimant had stopped

---

[3] A "stubber" is someone who works in a retail environment who does tasks such as taking slips off boxes of inventory, puts invoices in place for someone else to check, opens boxes, or takes apart corrugated cardboard boxes, but who does not stock shelves. (AR at 63.)

taking his medication, had been feeling increasingly depressed, and had started drinking to the point of passing out. (*Id*. at 21.) Claimant then started a fight with his brother, wanting his brother to take his life, which led to his arrest and wounds on Claimant's wrist and hand. (*Id*.) Claimant was discharged April 1, 2016 with new medications. (*Id*. at 19.)

### 2. Licensed Master Social Worker Claire Hunt

On January 29, 2015, one day after leaving the hospital for his attempted suicide-by-hanging, Claimant saw Claire Hunt at Hillcrest Family Services, the counseling center where he would receive most of his outpatient treatment for the relevant time period. (*Id*. at 417.) Ms. Hunt determined that Claimant had poor insight and judgment, a blunted affect, and a depressed/anxious mood, but intact memory. (*Id*.) Claimant saw Ms. Hunt four more times during 2015 (*Id*. at 405-12, 424, 461-62), and by August 2015, Ms. Hunt noted that Claimant seemed to be doing better. Claimant had a normal affect, a stable mood, normal speech, and was attentive. (*Id*. at 462.) Ms. Hunt noted that Claimant's insight, judgment, and memory were intact. (*Id*.) Claimant was feeling less depressed and had not been feeling suicidal. (*Id*.) Ms. Hunt noted Claimant was making "limited progress." (*Id*.)

### 3. Psychiatric and Mental Health Nurse Practitioner Elizabeth Brimeyer

On April 3, 2015, Claimant saw Elizabeth Brimeyer at Summit Outpatient Healthcare for psychiatric medication management. (*Id*. at 437.) Ms. Brimeyer noted although Claimant was attentive, he had slow thought processes, poor to fair judgment and insight as to his mental health needs, and that he self-medicated with alcohol. (*Id*. at 440-41.) Ms. Brimeyer diagnosed Claimant with depression, anxiety, and panic attacks. (*Id*. at 441.) She prescribed Prozac and Lorazepam. (*Id*.)

On May 19, 2015, Claimant returned to Ms. Brimeyer for psychiatric medication management. (*Id*. at 445.) In April, Ms. Brimeyer had added Seroquel to Claimant's

regimen, and he complained that while it helped him sleep, it also made him too tired. (*Id.*)  He had been off all medications for a week at the time of the May appointment. (*Id.* at 446.) Ms. Brimeyer made Claimant sign a "no harm" contract promising not to hurt himself before their next meeting, switched Claimant to Abilify, and decreased his Prozac dosage. (*Id.*)

### 4.     *Dr. Thomas Anderegg*

On April 9, 2015, Dr. Thomas R. Anderegg, saw Claimant for a consultative psychological examination on the referral of Disability Determination Services.  (*Id.* at 418-21.)  In part, Dr. Anderegg opined that Claimant would require "some supervision in order to carry out instructions reliably until they were well learned."  (*Id.* at 420.) Dr. Anderegg's opinion will be more fully discussed below.  *See infra* Part III.A.1.

### 5.     *Dr. Mark Mittauer*

On September 8, 2015, Claimant began psychiatric medication management at Hillcrest with Dr. Mark Mittauer.  (*Id.* at 463.)  Dr. Mittauer diagnosed Claimant with major depressive disorder, single episode, severe, without psychotic features; panic disorder with agoraphobia; generalized anxiety disorder; cannabis abuse in remission; and alcohol abuse versus dependence in remission.  (*Id.* at 464.)  Dr. Mittauer prescribed Venlafaxine, Zolpidem, and Hydroxyzine and recommended that Claimant "exercise, pursue fun activities, and do things with friends."  (*Id.* at 465.)  Dr. Mittauer's notes say that Claimant should follow up in "3 weeks or as needed." (*Id.*)   There is no indication in the record that Claimant returned to Hillcrest for medication management until January 2016.

### 6.     *Psychiatric and Mental Health Nurse Practitioner Dieter Boxmann*

On January 27, 2016, Claimant saw Mr. Boxmann for psychiatric medication management.  (*Id.* at 467.)  Mr. Boxmann noted Claimant avoided going places because he feared having a panic attack or a seizure.  (*Id.* at 468.)  Mr. Boxmann diagnosed

Claimant with major depressive disorder, recurrent, severe; panic disorder with agoraphobia; generalized anxiety disorder; cannabis abuse in remission; alcohol abuse in remission; possible conversion disorder (pseudoseizures). (*Id*.) Mr. Boxmann prescribed Clonazepam, Sertraline, and Quetiapine. (*Id*. at 469.) Claimant had been off Prozac for about two-and-a-half weeks at this point. (*Id*. at 468.) Claimant also saw Mr. Boxmann in May 2016, but at least one page of those notes is missing from the record. (*Id*. at 473-74.)

### 7. *Psychiatric and Mental Health Nurse Practitioner Mindy Roberts*

On September 20, 2016, Claimant began seeing Mindy Roberts for medication management at Hillcrest. By this time, Claimant's two-year-old daughter was living with him and his mother. (*Id*. at 475.) Claimant was apparently employing some coping mechanisms, telling Ms. Roberts that he was taking walks when he became anxious and that he was not giving into suicidal thoughts because he had his daughter to live for. (*Id*.) Claimant was not employed at this time, but Ms. Roberts encouraged Claimant to look for work because it would help with his anxiety and depression. (*Id*. at 476.) Claimant stated that he drank four beers on Saturday and did not take his medication that day because he understood that he cannot take medication with alcohol. (*Id*. at 475-76.) Ms. Roberts encouraged him to stop drinking. (*Id*. at 476.) Ms. Roberts diagnosed Claimant with major depressive disorder recurrent, episode/moderate; generalized anxiety disorder; and panic disorder with agoraphobia. Ms. Roberts ordered Venlafaxine, Bupropion, and Olanzapine. (*Id*.) Claimant told Ms. Roberts he was "going to work on employment" and would return in one month. (*Id*.)

On October 18, 2016, Claimant reported to Ms. Roberts that his depression had "improved tremendously," but that his "anxiety [was] out of control." (*Id*. at 478.) Claimant was experiencing stress due to fears his daughter's mother would take her during one of her visits and due to his aborted attempt to take GED classes. (*Id*. at 478-

79.) Claimant reported that he had been skipping his medications on Saturdays so he could drink beer. (*Id*. at 478.) Ms. Roberts cautioned him about the dangers of skipping medication and mixing alcohol with medications. (*Id*. at 479.)

On December 6, 2016, Claimant told Ms. Roberts that he felt his depression had improved even more, but that he was still having issues with his anxiety. (*Id*. at 481.) However, Claimant seemed hopeful. He stated, "[M]y medications are starting to work; I think it'll work better." (*Id*.) Claimant explained that most of his time was spent in his mother's house with his daughter, but that he was getting out of the house. (*Id*.) Claimant also reported that after having some visitation with their daughter, his daughter's mother's visitation was cancelled, which ended the visits, and had taken some stress off Claimant. (*Id*.) Ms. Roberts continued Venlafaxine and Clonazepam, increased Wellbutrin and Olanzapine, and added Propranolol to Claimant's medication regimen. (*Id*. at 482.) Claimant reported that he "has a few beers on the weekend" and knows not to take his medication at the same time, although Ms. Roberts wanted him to stop drinking all together. (*Id*.)

On January 31, 2017, Ms. Roberts quoted Claimant in her treatment notes: "I am doing much better." (*Id*. at 484.) Claimant reported that his depression was "greatly" improved and that his anxiety was even "more manageable" since his daughter's mother was incarcerated. (*Id*.) He could leave the house more by himself for short visits, for example, by going to appointments, but still spent much of his time at home with his daughter. (*Id*.) Claimant was still having "a few beers" on the weekend instead of taking his medications those days, and Ms. Roberts wanted him to stop drinking. (*Id*.)

On March 14, 2017, Ms. Roberts noted that Claimant said he was doing much better, but felt his anxiety was still keeping him from leaving the house more. (*Id*. at 487.) However, he was still going outside on short visits. (*Id*.) Claimant was still

drinking and Ms. Roberts was still encouraging him to stop drinking and to take his medications as prescribed. (*Id.*)

On April 3, 2017, Claimant told Ms. Roberts that he was "doing much better," although he was having a reaction to a new medication. (*Id.* at 490.) Ms. Roberts authorized a refill of Clonazepam, a drug Claimant had tried before and that he said worked best for him. Claimant still had a few beers on the weekend, and Ms. Roberts, again, encouraged him to stay compliant with his medication instead of drinking on weekends. (*Id.* at 490-91.)

### 8. *Licensed Mental Health Counselor Carrie Merrick*

Claimant saw Carrie Merrick on January 10, 2017. (*Id.* at 503.) On March 30, 2017, Ms. Merrick wrote a treating provider's opinion as to Claimant's limitations. (*Id.* at 494-99.) Ms. Merrick's opinion will be discussed below. *See infra* Part III.A.3.

### 9. *Agency Reviewers*

Lon Olsen, Ph.D. and Myrna Tashner, Ed.D. consulting psychologists, reviewed Claimant's records for the Social Security Administration initially and on appeal. Their opinions will also be discussed below.[4] *See infra* Part III.A.2.

---

[4] Jan Hunter, DO. and John May, M.D., consulting physicians, reviewed Claimant's medical records and statements and concluded that Claimant's non-epileptic seizure disorder was not a severe impairment because Claimant sought no treatment for the condition, inconsistently reported his seizure episodes, and because there was a lack of objective medical findings in the record. (AR at 85, 115.) Claimant does not make any arguments related to these opinions or his non-epileptic seizures, and thus has waived any arguments related to non-epileptic seizures.

In addition, the one medical record that seems to address possible seizures (AR 425-35), states that Claimant was taken from work to the emergency room with chest pain that Claimant thought was a seizure and that Claimant told the E.R. doctor he had never had a seizure that anyone witnessed. (*Id.* at 425.) This is contrary to what Claimant told other people, including what Claimant testified to at his hearing in this matter. (*Id.* at 58, 425, 468.) This inconsistency undermines Claimant's credibility. After running several tests, the E.R. doctor diagnosed Claimant with chest pain, prescribed aspirin, and told Claimant he could return to work. (*Id.* at

### C. *Vocational Expert Testimony*

Vocational Expert Stella Doering testified at the hearing. (*Id.* at 60-65.) When discussing hypotheticals, the ALJ and Ms. Doering had the following exchange, which included a limitation from Dr. Anderegg's opinion:

> ALJ:                        . . . if the person in doing unskilled work were to require supervision to carry out instructions, reliability [sic] until they were well learned, to me that sounds almost like supported employment. Is that a fair description of that limitation?"
>
> Ms. Doering:        Well, that's a big [sic] broad. It really depends on how you're defining well learned.

(*Id.* at 65.)

### D. *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that

_____

430.) It appears that Claimant did not return to work because his mother stated that Claimant has not worked since that trip to the E.R. (*Id.* at 373.)

supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## E.   *Duty to Develop the Record*

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir.1988)) (bracketed information added).

## III.   DISCUSSION

Claimant alleges his case should be remanded because (1) the ALJ erred by denying benefits at step 5 based on an RFC that did not include his need for extra supervision until tasks are "well-learned." In the alternative, Claimant asserts that even if the Court determines that remand is not required based on step 5 errors, remand is still required because the ALJ who decided his case was not properly appointed under *Lucia v. SEC*, 138 S. Ct. 2044 (2018).

After conducting a thorough review of the administrative record, **I find that the ALJ did not err at step 5 and the case need not be remanded under *Lucia*.** I will address each of Claimant's arguments, in turn.

***A.     Substantial evidence supports the ALJ's conclusions at step 5.***

The ALJ found that in spite of his limitations, Claimant had the following RFC:

[T]he claimant has the [RFC] to perform a full range of work at all exertional levels, but with the following nonexertional limitations: the claimant cannot work at unprotected heights, hazardous machinery or standing bodies of water. He can perform three to four-step tasks that are simple, repetitive and routine. The claimant cannot interact with the public, but can occasionally interact with co-workers and supervisors.

(AR at 30-31.)   Claimant argues that the case should be reversed and remanded for the ALJ to properly weigh the medical evidence in the record, "with particular attention to the special supervision limitation given that limitation seems to be outcome determinative given the vocational expert testimony." (Doc. 15 at 7.)

The claimant has the burden to prove his RFC. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). "Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," an RFC determination is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)). An ALJ is "required to consider at least some supporting evidence from a medical professional" when making an RFC determination. *Id.* at 712 (quotation and brackets omitted). "Where an ALJ does not rely on opinions from treating or examining sources, there must be some other medical evidence in the record for the ALJ's opinion to be supported by substantial medical evidence on the record." *Shuttleworth v. Berryhill*, No. 17-CV-34-LRR, 2017 WL 5483174, at *7 (N.D. Iowa Nov. 15, 2017) (citing *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004)), *R. & R. adopted by* 2018 WL 1660084 (N.D. Iowa Apr. 5, 2018).

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical

expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted).

### 1.   *Dr. Anderegg's Opinion*

The first person to include a supervision limitation in his opinion was consulting physician Dr. Anderegg, who examined Claimant on April 9, 2015.  (AR at 418.)  In relevant part, Dr. Anderegg opined that Claimant has

> problems with attention, concentration, and short-term auditory memory, [and that he is] capable of remembering an[d] understanding simple instructions, procedure, and locations. . . .  He would require some supervision in order to carry out instructions reliably until they were well learned.  His processing speed is in the normal range. . . . His judgment is intact.  He is capable of adjusting to changes in the workplace.

(*Id.* at 420.)  The ALJ gave Dr. Anderegg's opinion "little weight." (*Id.* at 33.)  For the reasons discussed below, I agree that the ALJ properly weighed Dr. Anderegg's opinion. A proper evaluation of a physician's opinion requires consideration of the following factors:  (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[5]  20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c).

---

[5] "Other factors" can include information claimants or others bring to the Social Security Administration's ("SSA") attention, or of which it is aware, which tend to support or contradict a medical opinion. "For example, the amount of understanding of [SSA] disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in [a claimant's] case record are relevant factors that [SSA] will consider in deciding the weight to give to a medical opinion." 20 C.F.R. § 404.1527(c)(6).

### a. Examining Relationship

"Generally, [ALJs] give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. § 404.1527(c)(1). Dr. Anderegg examined Claimant once for Disability Determination Services. "[T]he report of a consulting physician who examined the claimant once does not constitute 'substantial evidence.'" *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir.2000) (citation and internal bracket omitted). This factor is neutral.

### b. Treatment Relationship

"Generally, [ALJs] give more weight to the medical opinions from [a claimant's] treating sources. . . . When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). In addition, "the more knowledge a treating source has about [a claimant's] impairment(s), the more weight the [ALJ] will give the source's opinion." *Id.* at § 404.1527(c)(2)(ii). As noted above, Dr. Anderegg only saw Claimant once. As a licensed psychologist Dr. Anderegg has knowledge of Claimant's claimed impairments, but on the whole, the lack of a substantial treatment relationship weighs against giving Dr. Anderegg's opinion much weight.

### c. Supportability

Under 20 C.F.R. Section 404.1527(c)(3), "[t]he better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." Regarding the supervision limitation, I find that Dr. Anderegg's opinion is not well-supported. Dr. Anderegg stated that Claimant would require "some supervision in order to carry out instructions reliably until they were well learned." (AR at 420.) Dr. Anderegg did not define "well learned," and the term caused confusion at the hearing.

(AR at 65.)  However, Dr. Anderegg's opinion states that Claimant reported he is able to work by himself and at that time, Claimant was working at a job he had held for a year.  (*Id.* at 419.)  "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937 (citation omitted).  Although Dr. Anderegg did find that Claimant had some attention, memory, and concentration problems, Dr. Anderegg did not confine the supervision limitation to job tasks requiring good attention, memory, and concentration.  In addition, Dr. Anderegg said that Claimant was "capable of remembering an[d] understanding simple instructions, procedures, and locations;" that Claimant's processing speed was normal; and that Claimant was capable of adjusting to changes in the workplace.  (AR at 420.)

By giving Dr. Anderegg's opinion a generous reading and interpreting the attention, memory, and concentration notation as a limitation, the opinion may contain some evidence that supports his supervision limitation.  However, the entire opinion, especially the contemporaneous notes that document Claimant's then-current work situation, and the notes regarding work activities that Claimant can do, weighs against giving Dr. Anderegg's opinion much weight.  *See Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision); *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.") (citing *Pearsall*, 274 F.3d at 1217).

### d. *Consistency*

20 C.F.R. Section 404.1527(c)(4) provides that "[g]enerally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." Dr. Anderegg wrote his opinion more than two years before the hearing in this matter. Much had changed between the two events. For example, Claimant was no longer working by the time of the hearing. He quit his job either because he went to jail or because he had a seizure at work—Claimant has given both reasons for leaving his job. (AR at 53, 476.) Whatever his reason, Claimant apparently left the job on good terms and can return to this job, if he wants. (*Id.* at 476.) Claimant continued to seek employment and none of his mental health providers stated that he should not do so. In fact, as early as October 2016, Psychiatric and Mental Health Nurse Practitioner Mindy Roberts, the person whose treating relationship with Claimant is most thoroughly documented in the record, encouraged Claimant to look for a job because working would help alleviate his anxiety and depression. (*Id.*) She even made the practical suggestion that Claimant could have less contact with people by applying for night jobs. (*Id.*) In addition, Dr. Anderegg examined Claimant three months after he tried to kill himself. Claimant's suicide risk has consistently been rated as "low" since October 2016. (*Id.* at 479, 482, 485, 488, 491.) Moreover, when Claimant saw Dr. Anderegg, Claimant's sleep was poor: it was difficult for him to "both get to sleep and stay asleep" and he averaged only three-to-four-hours of sleep a night. (*Id.* at 419.) Claimant has been sleeping well since at least September 2016, as long as he is compliant with his medication regimen.[6] (*Id.* at 475, 478, 481, 484, 487, 490.)

---

[6] Claimant's hearing testimony that he only sleeps four-to-five hours a night on a "good night" and that it had been years since he slept seven-or-eight-hours in one night (AR at 57) is inconsistent with contemporaneous medical records. Claimant last reported good sleep in April 2017. (*Id.* at 475, 478, 481, 484, 487, 490.)

More importantly, no independent treating source indicated that Claimant needed a supervision limitation. Although Claimant stated that he takes a while to get used to new routines, he said that after he "gets into the routine, [he is] fine," which is not the same thing as needing constant supervisory attention. (*Id.* at 316.) Claimant never said that he needs help to learn new tasks or routines, and told Dr. Anderegg that he can work independently. (*Id.* at 419.) I will now examine the remainder of the record for underlying support for attention, memory, and concentration difficulties that might support Dr. Anderegg's support limitation.

Ms. Roberts saw Claimant more than any other medical professional referenced in the record. While Ms. Roberts is not a "medical source" under SSA regulations,[7] her treatment notes may be used to establish how Claimant's impairments affect his ability to function. *See* 20 C.F.R. § 404.1513(a)(2)(3); *Cronkhite v. Sullivan*, 935 F.2d 133, 134 (8th Cir. 1991) (citing 20 C.F.R. § 404.1513); SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006) (listing physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists as "medical sources"). Ms. Roberts saw Claimant six times between September 2016 and April 2017. (AR at 475-92.) As discussed above, Ms. Roberts never noted that Claimant needed a supervision limitation. To the extent Dr. Anderegg attempted to support the need for supervision on his conclusions regarding Claimant's attention, concentration, or memory difficulties, Ms. Roberts also never documented that Claimant had any of those difficulties. On the contrary, Ms. Roberts's notes consistently state that Claimant was "alert, pleasant, and cooperative," his "eye contact was good," his "thought process was logical, . . . [and his] intelligence and

---

[7] Licensed Advanced Practice Registered Nurses and "other advanced practice nurse[s] with another title" are considered acceptable medical sources for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1502(a)(7). Because Claimant's claim was filed January 9, 2015, Ms. Roberts is not an acceptable medical source who can render a medical opinion and she has not done so in this case.

memory present[ed] as normal, although not formally tested." (*Id.* at 476, 479, 482, 485, 488, 491.) Although Ms. Roberts's treatment notes document a trajectory of improvement for Claimant, she notes consistent noncompliance with medications insofar as Claimant skips his medications one day a week so that he can drink alcohol. Ms. Roberts has cautioned Claimant about the depressive effects of alcohol and her desire for him to take his medications every day and stop drinking. (AR at 475-76, 478, 481-82, 484, 487-88, 490-91.)

Even at Claimant's lowest point, right after his January 2015 suicide attempt, health care professionals did not document attention, concentration, or memory difficulties. On January 15, 2015, licensed master social worker Claire Hunt rated Claimant's concentration, immediate memory, recent memory, and remote memory as "good," the highest rating on a three-level rating scale. (*Id.* at 414-15.) On January 29, 2015, Claimant was attentive, had intact memory, and a logical thought process. (*Id.* at 417.) In April 2015, when Claimant was feeling more depressed and anxious because child support recovery was garnishing 65 percent of his paycheck, Ms. Hunt still noted that Claimant was "attentive" during their therapy session, that his memory was "intact," and that his thought process was "logical." (*Id.* at 424.)

In July 2015, Claimant was at a low point, "extremely drunk" at least one day a week, and had moved back in with his mother. (*Id.* at 461.) He told Ms. Hunt that his eventual plan might be to take his own life, even if he did not have a then-current intent to do so. (*Id.*) At that visit, Ms. Hunt noted that Claimant was attentive, that his memory was intact, but that his thought process was "illogical." By August 2015, Claimant was feeling less depressed and Ms. Hunt stated that Claimant once again had a logical thought process. (*Id.* at 462.)

In April and May 2015, psychiatric mental health nurse practitioner Elizabeth Brimeyer noted that Claimant was attentive, but did not comment on his attention,

memory, or concentration. (*Id.* at 440, 443, 446.) Dr. Mittauer saw Claimant once in September 2015, and found Claimant alert and cooperative with a logical thought process. (*Id.* at 464.) Claimant saw psychiatric mental health nurse practitioner Dieter Boxmann for medication management in January, May, and June 2015, and Mr. Boxmann noted that Claimant had "ok" concentration and a logical thought process. (*Id.* at 467, 469, 471.)[8]

I found one mention of "concentration," in the record in addition to Mr. Boxmann's notes, mentioned above. On May 19, 2015, Claimant returned to Ms. Brimeyer for a medication recheck two weeks after starting Seroquel to help him sleep. (*Id.* at 445.) Claimant stated that the drug helped him sleep at night, but made him tired all day, so he quit taking it after a week. (*Id.*) He had also run out of his Prozac, so had not taken any medications for a week at the time of the visit and was sleeping too much, having racing thoughts, anxiety that was "off the charts," and poor concentration and memory. (*Id.*) The next medication recheck in the record is a September 2015 appointment with Dr. Mittauer, who did not mention concentration issues, but said that Claimant was attentive. (*Id.* at 463.) This dearth of reference to not only a supervision limitation, but also to concentration, memory, and attention issues, leads me to conclude that Dr. Anderegg's opinion that Claimant needs a supervision limitation is not supported on the record as a whole. Therefore, this factor weighs against giving Dr. Anderegg's opinion much weight.

### e. *Specialization*

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Anderegg was a

---

[8]  Some pages of Mr. Boxmann's treatment notes are missing from the record.

licensed psychologist giving an opinion in his area of expertise. This factor weighs in favor of giving Dr. Anderegg's opinion more weight.

### f. Conclusion

Because a consulting psychiatrist's opinion as to a patient he has seen only once does not constitute substantial evidence, *see Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994), and because the preceding analysis has demonstrated that the record on the whole does not support Dr. Anderegg's conclusion regarding the supervision limitation, I find that the ALJ did not err in giving Dr. Anderegg's opinion little weight.[9]

### 2. Consulting Medical Opinions

The ALJ gave the opinions of the consulting psychologists Lon Olsen, Ph.D. and Myrna Tashner, Ed.D. "partial weight" because he found their opinions were inconsistent with the medical records. (*Id.* at 33.) In relevant part, Drs. Olsen and Tashner opined that Claimant "may need additional supervision until he has learned work activities." (AR at 76.) In formulating his own opinion, Dr. Olsen relied heavily on the opinion of Dr. Anderegg, giving Dr. Anderegg's opinion "great weight." (*Id.* at 76.) As discussed above, Dr. Anderegg's opinion on Claimant's supervision limitation is not supported by substantial evidence on the record as a whole. Therefore, for the same reasons that I find the ALJ assigned proper weight to Dr. Anderegg's opinion, I also find the ALJ assigned proper weight to Dr. Olsen's opinion because Dr. Olsen's opinion relies so heavily on Dr. Anderegg's opinion. Furthermore, because on appeal Dr. Tashner merely affirmed Dr. Tashner's opinion in its entirety (*Id.* at 119-20), I find that the ALJ also assigned proper weight to Dr. Tashner's opinion.

---

[9] Although not at issue, the record on the whole does support Dr. Anderegg's limitations related to Claimant's ability to work around the public and coworkers and the complexity of instruction and tasks Claimant can do for work.

### 3. Ms. Merrick's Opinion

The ALJ gave the opinion of licensed master social worker Carrie Merrick "little weight" because he found her opinion was not supported by the medical record and by the statements and testimony of Claimant.  (AR at 33.)  Ms. Merrick provided a "treating source opinion," on a check-box form provided by Claimant's attorney even though the record contains only one treatment note from her.  In relevant part, Ms. Merrick checked the boxes that state Claimant had moderate impairments in "maintain[ing] attention and concentration for extended periods of time," "understand[ing] and remember[ing] very short, simple instructions, and "sustain[ing] ordinary routine without special supervision."  (*Id.* at 497.)  "Moderate" limitations for purposes of this checklist "[p]reclude[] performance [of the skill for] up to 20% of an 8 hour work day or 40 hour work week."  (*Id.* at 496.)  She also checked the box that stated Claimant had mild impairments in "remember[ing] locations and work-like procedures" and "carry[ing] out very short and simple instructions."  (*Id.* at 497.)  In addition, Ms. Merrick checked the box indicating that Claimant had three or more "[e]pisodes of deterioration or decompensation in work work-like settings which cause [him] to withdraw from that situation or to experience exacerbation of signs and symptoms."  (*Id.* at 498.)

Ms. Merrick stated that Claimant had attended "weekly" therapy appointments the year before she wrote her opinion.  (*Id.* at 494.)  However, upon reviewing all records from Hillcrest Family Services, where Ms. Merrick works, Claimant only saw Ms. Merrick once and Hillcrest providers a total of seven times from May 2016 through May 2017, when Ms. Merrick wrote her opinion. (*See id.* at 404-17, 423-24, 453-515 (all Hillcrest treatment notes in record).) [10]  More importantly, as discussed above, none of the Hillcrest treatment notes support the conclusion that Ms. Merrick checked off stating

---

[10] Mr. Boxmann, Ms. Hunt, Dr. Mittauer, and Ms. Roberts and all work at Hillcrest.

that Claimant has moderate limitations in his abilities to sustain an ordinary routine without special supervision and to maintain concentration for extended periods of time or her written opinion that he is unable to work at all.

First, Ms. Merrick's opinion that Claimant cannot work is not supported by the record as a whole. As discussed above, none of the health care providers in the record state that Claimant cannot work. In addition, "[a] medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (citing *Stormo*, 377 F.3d at 806).

More importantly, the one treatment note from Ms. Merrick's single session with Claimant rates Claimant's concentration, immediate memory, and recent memory as "good," the highest rating on a three-level rating scale; his remote memory and judgment as "fair," the middle rating on the three-level rating scale; his intelligence as "average;" and his attitude, behavior/motor, speech, thought content, and thought process all "within normal limits."[11] (*Id.* at 512-14.) In addition, at most, Claimant had one seizure of unknown origin at work, not three or more. *See supra* n.5. And, since Claimant told different people that he left his last job because he was in jail, not because he had a seizure, this may not even be true. (*See id.* at 373, 476.) It is also significant that the doctor who saw Claimant when he was taken to the E.R. from work for what Claimant feared was a seizure diagnosed Claimant with chest pain, not a seizure, treated Claimant with aspirin, and cleared Claimant to return to work. (*Id.* at 430.)

---

[11] There are two single-sentence notes at the bottom of Ms. Merrick's treatment notes that seem to be summaries of Claimant's sessions with mental health care providers. Both dates correspond to sessions Claimant had with Ms. Roberts, although the notes do not seem to be hers. (AR at 514.)

Moreover, because Claimant refuses to see a neurologist, in spite of Ms. Roberts's encouragement, there is no way to assess the credibility of any statements related to allegations of seizures, other than to note that the administrative record contains no medical records related to seizures other than Claimant's self-reports of a seizure disorder. Furthermore, Ms. Merrick's opinion consists of checklists and short fill-in-the blank answers, cites no medical evidence, and gives very little explanation for its conclusions. "'The checklist format, generality, and incompleteness of the assessments limit the assessments' evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."). The checklist nature of this opinion is especially problematic because Ms. Merrick fails to define the term "special supervision." With no explanation or citation to medical records, the limitation is ambiguous at best and unhelpful at worst. Accordingly, I find that the weight given to Ms. Merrick's opinion was also appropriate. *See Papesh*, 786 F.3d at 1132 (a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions").

### 4.    *Other Considerations*

The record also demonstrates that Claimant has been noncompliant with his medication regimen, consistently skipping his medications on weekends so he can drink alcohol. Although Claimant apparently chooses to drink in this way to avoid the dangerous side effects of mixing his medications with alcohol, Ms. Roberts has persistently explained to him the need to stop drinking and take medications seven-days-

a-week.[12]  A claimant's failure to take medications as prescribed undermines the claimant's disability claim.  *See Wagner*, 499 F.3d at 851-52.  In spite of this lack of consistent compliance, Claimant has shown continuous improvement on the medications he takes six days a week, telling Ms. Roberts at every session since October 2016 that he has been getting better.  (AR at 478, 481, 484, 487.)  An impairment that is controlled with medication is not considered disabling.  *See Brace v. Astrue*, 578 F3d. 882, 885 (8th Cir. 2009) (citations omitted).  Thus, even while Claimant's anxiety is still not as controlled as his depression, and Claimant still claims to spend most of his time in the house with his daughter, none of his health care providers has stated that he should stay at home as much as he does.  In fact, Dr. Mittauer and Ms. Roberts both encouraged Claimant to get out of the house and do things, and Ms. Roberts practically suggested that finding a job on the night shift would be a way Claimant could both work and avoid contact with too many people, even before Claimant experienced marked improvement on the medication regimen Ms. Roberts prescribed for him.  (AR at 465, 476.)  Claimant goes to the store to purchase food and cigarettes; takes walks when he feels anxious; and, at his last session with Ms. Roberts a month before the hearing in this matter, he asked to switch his anxiety medication to Clonazepam, which is the medication that worked best for him in the past.  (*Id.* at 313, 475, 478, 490.)

As mentioned, Claimant's depression seems well-controlled, but he has anxiety issues.  A review of the record, however, reveals that his anxiety has been related to situational stressors.  For example, financial stress; the stress of moving back home with an ill mother; the stress of having his two-year-old daughter live with him and his mother for the first time and a custody battle with the child's mother; fears the child's mother

---

[12] At his hearing, Claimant testified that he had not had a drink for about a year, but treatment notes document that Claimant never gave up drinking and, indeed, was still drinking at least one-day-a-week one month before the hearing.  (AR at 478, 481, 484, 487, 490.)

would kidnap her during visitations and anxiety over his GED class; and relief of stress when the mother of his child was incarcerated and unable to visit with their daughter. (*Id*. at 464-65, 475, 478-79, 481, 484.)  Situational stressors do not rise to the level of mental impairment.  *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039-40 (8th Cir. 2001).  I also note that the ALJ accounted for Claimant's anxiety related to being around people in the RFC.

Finally, the medical opinions that, on first blush, seem to include the same supervision limitation, actually do not support the limitation.  Therefore, in addition to all the reasons stated above that support the ALJ's conclusion, the ALJ was also justified in not including a supervision limitation in the RFC.

Dr. Anderegg's limitation states that Claimant requires "some supervision in order to carry out instructions reliably until they were well learned." (AR at 420.)  This makes the limitation mandatory, although "some" does not indicate if supervision needs to be constant, periodic, daily, weekly, in-person, remote, or via CCTV or some other form of communication.  The consulting physicians opined that Claimant "may need additional supervision until he has learned work activities." (AR at 76.)  This makes the limitation speculative or contingent on some unknown factor.  Ms. Merrick opined that Claimant would be precluded from "sustain[ing] ordinary routine without special supervision" for "up to 20% of an 8 hour work day or 40 hour work week." (*Id*. at 496-97.)  A literal reading of Ms. Merrick's limitation is that Claimant would only need supervision up to 1.6 hours a day or eight hours a week, which is not the same as "some" supervision or contingent or speculative supervision.  And, of course, the term "special supervision" is as cryptic and undefined as the terms "some supervision" and "well learned" in Dr. Anderegg's opinion.  Therefore, the inconsistencies in the various supervision limitations is another reason the limitation Claimant seeks is not supported by substantial evidence on the record as a whole.

### 5.    *Conclusion*

I conclude that although the ALJ did not give any particular medical opinion controlling weight, he did rely on supporting evidence from medical opinions in crafting the RFC.  *See Shuttleworth*, 2017 WL 5483174, at *7 (noting that the ALJ attributed "little weight," rather than "no weight" to opinion of treating physician).  Specifically, the ALJ considered the medical evidence in the record, and gave some weight to the opinions and included limitations from the opinions in her RFC, including limitations on Claimant's contacts with the public and coworkers and on the level of instructions Claimant could understand.[13]  Although the ALJ did not identify the specific evidence she found inconsistent with the various medical opinion evidence, she weighed opinion evidence earlier in her opinion when evaluating Claimant's impairments.  (AR at 30.) My independent review of the record demonstrates that substantial evidence in the record as a whole supports the ALJ's decision. *See Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987) (holding that an "arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably ha[s] no practical effect on the outcome of the case").  I therefore recommend affirming the ALJ's decision at step 5.

---

[13] Dr. Anderegg opined that Claimant would have marked limitations interacting appropriately with the public, supervisors, and coworkers. (AR at 420.) Ms. Merrick opined that Claimant would have mild limitations working in coordination or proximity to others without being distracted by them (*Id.* at 497) and marked limitations in his abilities to interact with the public and to get along with coworkers and peers. (*Id.*)  Drs. Olsen and Tashner opined that Claimant "should not be expected to deal with the public . . . [and] will function best when social demands from coworkers and supervisor are minimized." (*Id.* at 76, 119.) Dr. Anderegg opined that Claimant could remember and understand simple instructions, procedures, and limitations.  (*Id.* at 420.)  Ms. Merrick opined that he would have mild limitations in carrying-out very short and simple instructions and remembering work-like procedures and moderate limitations in understanding and remembering very short, simple instructions and detailed instructions.  (*Id.* at 497.)  Drs. Olsen and Tashner opined that Claimant is capable of "three- and four-step activities that do not require intense concentration." (*Id.* at 76, 119.)

**B.** **Claimant failed to timely raise her Appointments Clause argument under *Lucia v. SEC*.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that Social Security Administration ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. Claimant asserts this Court should vacate the denial of benefits by ALJ Mein and remand the case for decision by what he contends is a properly-appointed ALJ. Claimant admits that he is asserting his Appointments Clause challenge for the first time in his opening brief to this Court.

Claimant does not argue that his case presents any factual or procedural differences from other cases that have previously been addressed by this Court. Indeed, this case has the same procedural posture as several other cases wherein this Court already addressed this issue (i.e., all administrative proceedings, including denial by the appeals council, were completed before *Lucia* was decided). However, for the first time that I am aware of, a claimant cites a Report and Recommendation wherein a Magistrate Judge recommends remanding a case based on *Lucia* arguments. (Doc. 17-2, *Muhammad v. Berryhill*, No. 18-172 (E.D. Penn. Nov. 2, 2018).) In *Muhammad*, The Honorable Timothy R. Rice acknowledged the few courts, including the Northern District of Iowa, that had at that time addressed the *Lucia* issue in the context of Social Security cases. *Muhammad* noted that the cases relied on the timeliness of the claimants' challenges, and that they uniformly held that Social Security claimants were time barred from asserting *Lucia* claims for the first time before the district courts. (Doc. 17-2 at 8.) Judge Rice based his recommendation for reversal on the non-adversarial nature of the Social Security administrative process, which often involves "*pro se* litigants unskilled in the

law and nuances of concepts like waiver, forfeiture, and the Appointments Clause." (*Id.* at 10-11.) To this end, Judge Rice asserted that it would have been futile for the claimant in *Muhammad* to raise the Appointments Clause challenge at the administrative level because EM-18003 made it futile for him to raise this argument before the Social Security Administration.[14] (*Id.* at 11.) Judge Rice concluded that a remand to have the claimant's case heard by a different ALJ whose appointment had been ratified by the Commissioner was proper.[15] (*Id.* at 12.) *See also Bizarre v. Berryhill*, No. 1:18-CV-48, 2019 WL 1014194, at *7 (M.D. Penn. Mar. 4, 2019) (remanding case "for rehearing before a constitutionally appointed ALJ" because raising the issue during the administrative process would have been futile and because no SSA statute or rule requires constitutional issues to be raised during the administrative process at the risk of forfeiture). Claimant urges this Court to adopt the reasoning of the *Muhammad* court.

This Court has ruled in favor of the Commissioner on similar claims on five occasions. *See White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have

---

[14] EM-18003 is an emergency message issued on January 30, 2018 instructing ALJs to acknowledge Appointments Clause arguments while prohibiting them from "discussing or making any findings" on those arguments. (Doc. 13-1.)

[15] *Muhammad* noted that EM-18003 REV 2 informed Social Security personnel that the Commissioner had ratified the appointments of all current ALJs. (Doc. 17-2 at n.11.)

forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at \*3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).

In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id*. In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.

Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

*Stearns*, 2018 WL 4380984, at \*\*5–6 (paragraph break added).

As previously stated, Claimant does not claim that his case presents any factual or procedural differences from the cases cited above. In addition, I do not find the reasoning of *Muhammad* and *Bizarre* persuasive because the Eighth Circuit has held that a party forfeits an Appointments Clause claim by failing to raise it to the agency. *See Kimberly B. v. Berryhill*, No. 17-CV-5211 (HB), 2019 WL 652418, at \*14 (D. Minn. Feb. 15, 2019) (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013)). In the Social Security context, a claimant who fails to raise a claim before the ALJ waives the claim on appeal. *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing. Accordingly, this claim was waived from

being raised on appeal.") Accordingly, I recommend that Claimant's request for remand on this basis should be denied.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ** and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 3rd day of April, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa